710 So.2d 1138 (1998)
Johnny Van ALLEN and Dianne Allen
v.
PAYNE & KELLER COMPANY, INC., and Ranse Stafford.
No. 96 CA 2326.
Court of Appeal of Louisiana, First Circuit.
April 8, 1998.
Rehearing Denied June 2, 1998.
*1139 Michael H. Colvin, Baton Rouge, for Plaintiffs-Appellants.
David H. Hardy, Baton Rouge, for Defendants-Appellees.
Before LOTTINGER, C.J., and SHORTESS, GONZALES, FOGG and GUIDRY, JJ.
SHORTESS, Judge.
This appeal arises out of a suit brought by Johnnie[1] Van Allen (Allen) and his wife, Dianne Allen (collectively plaintiffs), against Allen's employer, Payne & Keller Company, Inc. (Payne) and Rantz[2] Stafford (Stafford), Allen's former co-worker (collectively defendants), as a result of a personal injury received by Allen when Stafford "bumped" him while he was bending over, injuring Allen's head. This case presents the issues of 1) did Stafford commit the intentional tort of battery upon Allen; 2) if so, is Payne vicariously liable for Stafford's battery and/or an intentional tort for not allowing Allen to wear protective headgear prescribed by his physician; and 3) did Payne unlawfully discharge Allen for filing workers' compensation claims.

FACTS
Allen was employed by Payne for three years as a warehouseman at Melamine Industrial Plant in Donaldsonville, Louisiana. Allen had an implant in his head, a deep brain stimulator (DBS), in order to control his chronic back pain. After a previous accident, he was required to wear protective headgear, a "bump cap," while working, to prevent injury to his stimulator. On October 17, 1990, Stafford hit Allen with his knee in the buttocks as Allen was bending over in the warehouse. Allen fell forward and hit his head. Allen completed working that day and the following day, but he was not able to go to work on October 19, 1990. That same day Payne terminated Allen and Stafford for misconduct. In January 1991, Allen had surgery to have one of the electrodes in his DBS replaced, and subsequently the DBS was replaced with a Pisces Unit (a unit connected to his spinal cord to control pain). On August 1, 1991, plaintiffs filed a petition for damages against defendants and Transportation Insurance Company[3] for injuries Allen sustained, *1140 for Mrs. Allen's loss of consortium, and for Allen's unlawful discharge. Following a trial on the merits, the jury returned a verdict in favor of defendants and dismissed plaintiffs' suit. Plaintiffs bring this appeal.
Plaintiffs raised four assignments of error: They allege the jury's verdict was manifestly erroneous 1) in finding Stafford did not commit a battery upon Allen on October 17, 1990; 2) in failing to find that Payne committed an intentional tort that caused injury to Allen by forbidding him to wear the helmet prescribed by his physician and causing injury to him; 3) in failing to find that Payne unlawfully terminated the employment of Allen; and 4) in failing to award damages and other legal relief to plaintiffs. However, the jurisprudence provides that an appellate court may reverse a fact-finder's determinations only when it has found from the record that a reasonable factual basis does not exist for the findings and that the record establishes the findings were manifestly erroneous and clearly wrong.[4]

THE BATTERY
The Louisiana Workers' Compensation Act provides for compensation if an employee sustains personal injury as the result of an accident arising out of and in the course of employment.[5] Ordinarily, the rights and remedies granted to an employee under the act are exclusive of all rights and remedies against the employer, any officer or principal of the employer, or any co-employee.[6] However, an exception to this rule is liability from an intentional act.[7]
Plaintiffs contend Allen is "a classic tort eggshell victim." Prior to his employment with Payne, Allen injured his back and had undergone multiple operations on his spine, which left him with chronic back pain. In 1981, he went to Dr. Donald Richardson, a neurosurgeon in New Orleans. At that time Richardson placed an electrode in Allen's brain to stimulate an area of the brain that activates a system that is inhibitory to pain. This device is referred to as a deep brain stimulator or DBS. The DBS raised Allen's level of tolerance to discomfort high enough so that he would not feel his chronic back pain. The DBS was implanted in his head, which left a raised area from the wires and made him quite vulnerable to injury.
Plaintiffs further contend Stafford knew of Allen's condition and committed the intentional tort of battery when he "bumped" Allen. Plaintiffs also allege Stafford admitted in his testimony that he did not have Allen's permission to make physical contact but still made the contact.
Consequently, defendants concede intentional contact was made. However, in order to find a battery occurred, defendants maintain the jury also must have found Stafford "(1) intended to inflict a harmful or offensive contact upon Johnn[ie] Allen; and (2) that a harmful or offensive contact took place; and (3) that Johnn[ie] Allen did not consent to the contact." Thus, defendants allege the record shows it was reasonable for the jury to conclude that "(1) Mr. Stafford did not intend to inflict a harmful or offensive contact, or (2) no harmful or offensive contact occurred, or (3) Mr. Allen consented to the contact."
In Caudle v. Betts,[8] the supreme court defined a battery as "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." (Citations omitted.) The court went on to state:
The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good. *1141 (Citation omitted.)[9] In Caudle, the court found the fact that the chief executive officer of the employer merely intended his shocking of the employee with an electric automobile condenser as a practical joke, and that he did not intend to inflict actual damage, did not render him immune from tort liability.[10]
Stafford admitted at trial he intended to hit Allen and also, at the time, both of them were not engaged in horseplay. Stafford's account was as follows:
I was doing something at the front counter and I was walking back to the back of the warehouse. I don't remember ... recall why. I don't know what I was doing, but I was walking down the aisle and I seen him bent over in an aisle, stooped over looking for something or getting some material or something. And I went up behind him and I looked behind me and I seen Chris Whitehead coming up and I turned and looked at him and took my right knee and hit on the behind.
Stafford went on to testify:
Q. Okay. At the time this happened, he was horseplaying with you?
A. Oh, no. Not at the time it was happening, no. He only can do one thing at a time, I guess.
Q. So, what was he doing when you did this?
A. He was working.
Therefore, by Stafford's own testimony, he intended the contact. Although he may not have had malicious intent, the contact did occur, irrespective of his playful nature. Furthermore, from Stafford's testimony, it is evident Allen did not consent to the contact since he was stooped over and was not engaged in horseplay, as admitted by Stafford. In addition, Stafford hit him from behind. Thus, we find the jury's finding that Stafford did not commit a battery clearly wrong.

VICARIOUS LIABILITY OF PAYNE
Louisiana Civil Code article 2320 provides the basis for holding an employer liable for the actions of its employees, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
According to the supreme court in Jones v. Thomas,[11] an employer may incur vicarious liability for the intentional acts of employees. The law in this area is clear that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment.[12] The course of employment test refers to time and place.[13] The scope of employment test examines the employmentrelated risk of injury.[14]
However, an employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours.[15] Vicarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective.[16]
The test for employer liability was established by the supreme court in LeBrane v. Lewis.[17] In LeBrane, an argument occurred between a hotel supervisor and an employee whom he had terminated. This resulted in a fight wherein the supervisor stabbed the employee. The court found the fight was "employment rooted," for the fight was reasonably incidental to the performance of the supervisor's duties in connection with firing the employee and causing him to leave the place of employment, and the fight occurred *1142 on the employment premises and during the hours of employment.[18] The court also held an employer is responsible for an employee's intentional tort when the conduct is so closely connected in time, place, and causation to the employment duties that it constitutes a risk of harm attributable to the employer's business.
In this case, the intentional tort occurred on the employment premises and during the hours of employment. However, it was not incidental to the performance of Stafford's duties as a warehouseman. In order for the employer to be liable vicariously, there must be some type of employer-related catalyst, meaning the act performed (the intentional tort) should have some link to an employment-required duty. The record does not reveal in any way that Stafford's "bumping" was caused or linked to any employment duties.

INTENTIONAL TORT OF PAYNE
In March 1990, Allen injured his head when he hit a fan in the storeroom at work. This injury required replacing an electrode in his DBS in July 1990. When he returned in August 1990, it was recommended he wear protective headgear, although other workers in the warehouse were not required to wear protective headgear. All of the usual caps supplied by Melamine Chemicals hurt the implant area. Richardson prescribed a bicycle helmet to be worn. However, Ken Wilkinson, the maintenance manager for Payne, required Allen to wear a bump cap (a plastic cap with a ¼-inch suspension) so his implant was not irritated.
Plaintiffs allege Payne forbade Allen to wear the protective headgear prescribed by his treating physician, Richardson. Plaintiffs maintain since Payne was aware of Allen's condition, and knew he was susceptible to injury, liability arose since Payne knew injury was certain or substantially certain to result from not permitting him to wear the prescribed headgear. Plaintiffs further argue Allen was forced to wear a hat not approved by any safety organization or safety department in the chemical industry, contradictory to his doctor's directions.
Jerry Bass, the safety supervisor for Melamine Chemicals, testified the bicycle helmet prescribed by Richardson was approved by American National Standards Institute (ANSI) only for "bicycle use." Bass went on to state he would not have approved the "bump cap" to be worn by Allen because it was not approved by ANSI. However, it appears from the record the bicycle helmet was not safety approved for this workplace.
Plaintiffs cite the language of White v. Monsanto,[19] "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." However, in White, the court gave guidance to the meaning of an intentional tort:
"LSA-R.S. 23:1032 makes worker's compensation an employee's exclusive remedy for a work-related injury caused by a coemployee, except for a suit based on an intentional act. The words "intentional act" mean the same as "intentional tort." The legislative aim was to make use of the well-established division between intentional torts and negligence in common law. The meaning of "intent" is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself. Only where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow has an act been characterized as intentional."[[20]]
According to White, "intent" refers to the "consequences of the act" and not the act itself. While there is a discrepancy as to why Allen was not allowed to wear the hat *1143 prescribed by his physician, there was no evidence that showed Payne intended the consequences of his injury. It appears from Richardson's September 17, 1990, letter that the bicycle helmet was an alternative to the construction helmet initially provided, which interfered with Allen's DBS, but possibly was not the only hat that could be protective. Rudy Simoneaux, safety manager for Payne, testified the reason the "bump cap" was chosen was due to its brim, which protected one's face from falling items. Furthermore, there was no testimony stating the bicycle helmet would have prevented the injury or even lessened the injury to Allen. The videotape of Richardson's deposition was played at trial, and even he did not mention a difference in the protection of the two caps. It appears from the evidence that all parties were interested in protecting Allen from further injury; that Payne's action was not intended to cause, or Payne was not substantially certain its action would cause, injury to Allen. This assignment of error has no merit.

RETALIATORY DISCHARGE
Plaintiffs contend Payne unlawfully terminated Allen's employment because of his medical expenses and past workers' compensation claims. Furthermore, while he and Stafford were both fired for misconduct (horseplaying), two weeks later Payne rehired Stafford. Allen contends he is entitled to penalties and attorney fees for unlawful termination.
Louisiana Revised Statute 23:1361 provides:
§ 1361. Unlawful discrimination prohibited
A. No person, firm or corporation shall refuse to employ any applicant for employment because of such applicant having asserted a claim for worker's compensation benefits under the provisions of this Chapter or under the law of any state or of the United States. Nothing in this Section shall require a person to employ an applicant who does not meet the qualifications of the position sought.
B. No person shall discharge an employee from employment because of said employee having asserted a claim for benefits under the provisions of this Chapter or under the law of any state or of the United States. Nothing in this Chapter shall prohibit an employer from discharging an employee who because of injury can no longer perform the duties of his employment.
C. Any person who has been denied employment or discharged from employment in violation of the provisions of this Section shall be entitled to recover from the employer or prospective employer who has violated the provisions of this Section a civil penalty which shall be the equivalent of the amount the employee would have earned but for the discrimination based upon the starting salary of the position sought or the earnings of the employee at the time of the discharge, as the case may be, but not more than one year's earnings, together with a reasonable attorney's fee.[[21]]
Allen testified he completed working on the day of the accident and worked the day after the accident. Allen stated that on October 19, 1990, he was too dizzy to drive all the way to work and went back home. The pink slip mailed to Allen stating he was terminated was dated October 19, 1990. Even though Dr. Richardson stated at deposition that Allen was disabled, Allen was working at the time of his discharge.
In Ducote v. J.A. Jones Const. Co.,[22] the court stated:
The purpose of La. R.S. 23:1361 is to prevent unjust dismissals and to allow employees to exercise their right to workman's compensation benefits without fear of retaliatory action by their employer. An employer cannot simply invent a violation of a safety rule or stretch the facts of a situation out of context so he has an excuse for firing an employee who has made a compensation claim.
*1144 Inasmuch as we have found earlier in this opinion that the jury committed manifest error on the battery issue, we will now proceed to determine with a de novo[23] review of the record whether Payne violated Revised Statute 23:1361 when it discharged Allen two days after the battery occurred.
Unlawful employment discrimination is prohibited, as aforesaid, in Revised Statute 23:1361, and gives a cause of action in district court to a plaintiff who claims such discrimination. The plaintiff has the burden of proof, just as in any other civil case.[24]
There is no disagreement that at a safety meeting between Melamine and Payne personnel, Allen was the object of discussion. That meeting was held shortly before the battery in this case. Jerry Bass, safety supervisor for Melamine, testified that at that meeting Ken Wilkinson, Payne's maintenance manager, said that something had to be done about Allen's employment; that his medical expenses were getting them in trouble; and that they would have to find a way to "get rid of Johnn[ie]." Bass was very candid. He testified, "I had no comment. I really didn't want to hear that.... It's not the kind of thing to say in a meeting of that type."
Against that backdrop, the battery described above occurred on October 17, 1990, and within two days, Allen and Stafford were terminated. The reason given was misconduct, i.e., horseplay.
The factual basis for the termination was developed by Lawrence Winters, Payne's site supervisor. His duties were to take care of safety and performance by all Payne employees. After he conducted his interviews, he felt that Stafford and Allen should be terminated because of misconduct or horseplay on the job site. He talked to Wilkinson, who concurred.
On cross-examination, Winters described the misconduct as "tripping back and forth" by Stafford and Allen. When pressed, Winters said specifically that the statements of Stafford, Chris Whitehead, and Rick Irvine, were the basis for his action. We have read closely all three statements; none mention Allen and horseplay. Winters adamantly maintained his position throughout the crossexamination that he used no information to make his decision to fire Allen except facts contained in the three statements.
On redirect, Payne's attorney attempted to rehabilitate Winters on his testimony regarding the statements. Winters testified his recollection was that there was another statement that indicated horseplay. That statement was never introduced and is not part of this record.
Stafford's testimony on this issue was very enlightening. He testified that within two weeks of his termination, he had been rehired by Payne and was working as an electrician's helper at the Uniroyal plant. The perpetrator of the battery lost two weeks of work, while Allen, the victim, has not worked since he was fired by Winters two days after the battery was committed.
All these factors and the entire record considered, we find Johnnie Van Allen has clearly proven by a preponderance of the evidence that his discharge by Payne was unlawfully discriminatory, violating Revised Statute 23:1361. We hold that he shall recover the statutory penalty provided therein of one year's earnings, i.e., $7.51 per hour × 40 hours per week × 50 weeks, for a total of $15,020.00, together with reasonable attorney fees of $4,500.00.

DAMAGES
Richardson testified Allen had undergone a series of back surgeries prior to the *1145 installation of the DBS in April of 1981. He went on further to state that since that time he had performed approximately four surgeries for maintenance of the DBS.[25] Allen had injured his head in March 1990, another electrode was replaced in July of that same year, and he was released back to work in August. Richardson testified that before the accident, on October 8, 1990, he examined Allen, and the stimulator was working fine. At that time, Allen was working a twelve-hour day without any difficulty. Richardson stated the next time he saw Allen was October 29, 1990; the stimulator was not working properly at that time. Richardson concluded, based on the facts, that the malfunction of the stimulator was due to the accident on October 17, 1990.
Allen testified that after the accident, his stimulator was not giving him proper relief. By the second day after the accident he was dizzy (which is why he could not go to work). Allen's wife testified she inspected the wire site in his head on the afternoon of the accident, and "it was puffy and red." Mrs. Allen stated because Richardson was out of town, an appointment was not scheduled until October 29, 1990. During that time, Allen was dizzy and his equilibrium was off, so they went to see his family physician, Dr. Timothy Ewing, who provided medication for the dizziness. Richardson stated at the time he saw Allen, the stimulator was still working, but Allen was becoming confused and was not getting great pain relief. He stated an electrode was replaced in January 1991. Richardson testified the DBS was ultimately replaced with the Pisces Unit with two operations, one in July 1991 and the other in September 1991.[26] Richardson stated because the amount of pain Allen sustains could not be controlled (because the Pisces unit does not provide enough pain relief), he was totally disabled.[27]
Mrs. Allen testified prior to the accident, Allen was working "turnaround," seven days a week, twelve to sixteen hours a day. She also stated he helped chop wood and helped around the house. She went on to testify that after the accident Allen was frequently confused and would lose his memory. She said he no longer was able to help with the housework because of the pain, nor were they able to engage in sexual relations very often because of pain. She stated her calculated total cost of his medical bills was $62,084.00.[28]
Dr. Bernard Pettingill, an economist, testified he reviewed the medical and financial records of Allen. He stated based upon the records of Richardson, in his opinion, Allen cannot go back to gainful employment. He calculated two periods of lost income: period one was 3.13 years, the time since Allen had worked until the date of trial; and period two was 18.4 years, the time from the date of trial until Allen would have retired.[29] Pettingill calculated his past lost income to be $47,012.00.[30] Pettingill estimated his loss of income at future and present value to be $479,603.00 and $254,747.00, respectively.[31] However, if Allen worked at a light-duty minimum-wage position, the present value is *1146 reduced to $177,978.00.[32] He also testified Allen would need approximately $32,843.00 for health insurance he lost because he is no longer employed.
In light of the evidence and the physical injuries suffered by Allen, we find the jury was manifestly erroneous in its factual finding that Stafford had not committed the intentional tort of battery by "bumping" Allen on October 17, 1990. After a de novo review of the record, we find the sum of $200,000.00 is adequate to compensate Allen for his general damages for pain and suffering and all his special damages, past and future medical, and past and future income. We also find Allen is entitled to the sum of $15,020.00 for one year's income, plus $4,500.00 in attorney fees for the unlawful discharge from Payne.

CONCLUSION
For the foregoing reasons, the judgment of the trial court dismissing plaintiffs' suit against defendants is reversed. Judgment is hereby rendered in favor of Allen and against Stafford in the sum of $200,000.00 for the intentional tort of battery. Also, judgment is rendered in favor of Mrs. Allen for loss of consortium and against Stafford in the sum of $10,000.00. The sums of $15,020.00 for retaliatory discharge and $4,500.00 in attorney fees are awarded in favor of Allen and against Payne. Costs of this appeal are assessed to Payne.
REVERSED AND RENDERED.
LOTTINGER, C.J., dissents and assigns written reasons.
GONZALES, J., respectfully dissents for the reasons assigned by LOTTINGER, J.
LOTTINGER, Chief Judge, dissenting.
I respectfully dissent.
In this jury trial case, the jury apparently believed that prior horseplay between Van Allen and Stafford with no objection by Stafford constituted a continuing consent to such horseplay. There is nothing in the record to prove that the jury was manifestly erroneous in this finding.
Therefore, I would affirm.
NOTES
[1] Allen's first name is misspelled "Johnny" in the trial court petition.
[2] Stafford's first name is misspelled "Ranse" in the trial court petition.
[3] Plaintiffs initially erroneously designated Transportation Insurance Company as CNA Insurance Companies. However, plaintiffs voluntarily dismissed Transportation prior to trial as a defendant.
[4] Stobart v. State, 617 So.2d 880, 882 (La.1993).
[5] La. R.S. 23:1031.
[6] La. R.S. 23:1032.
[7] Caudle v. Betts, 512 So.2d 389, 390 (La. 1987), citing Bazley v. Tortorich, 397 So.2d 475, 482 (La.1981).
[8] 512 So.2d at 391.
[9] Id.
[10] Id. at 392.
[11] 426 So.2d 609, 612 (La.1983).
[12] Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224, 226.
[13] Benoit v. Capitol Manufacturing Co., 617 So.2d 477, 479 (La.1993).
[14] Id.
[15] Baumeister v. Plunkett, 95-2270, p. 4 (La.5/21/96), 673 So.2d 994, 996.
[16] Id.
[17] 292 So.2d 216 (La.1974).
[18] Id. at 218.
[19] 585 So.2d 1205, 1208 (La.1991).
[20] Id. (citing Bazley v. Tortorich, 397 So.2d 475 (La.1981)).
[21] While Revised Statute 23:1361 was amended in 1993, this version was applicable at the time Allen was discharged.
[22] 471 So.2d 704, 707 (La.1985).
[23] See Ferrell v. Fireman's Fund, 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747. Therein, the supreme court instructs courts of appeal that when legal error interdicts the fact-finding process, the appellate court should make its own independent de novo review to determine a preponderance of the evidence and enter whatever judgment is appropriate in the case.

Later, in Thompson v. State, 97-0293, p. 4 (La.10/31/97), 701 So.2d 952, 956, Justice Traylor, for the majority, cited Ferrell and held: "`[W]hen the court of appeal finds that a reversible error of law ... was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.'"
[24] Orr v. Bancroft Bag, Inc., 29,046, p. 2, (La. App.2d Cir. 1/22/97), 687 So.2d 1068, 1070.
[25] Richardson replaced an electrode in the DBS once in 1986 and twice in 1989. Also in 1989, the receiver and the battery were replaced.
[26] Richardson stated the DBS was finally removed because Allen kept trying to use it to get relief and it was confusing him. Also, another Pisces electrode was installed in March 1992.
[27] However, since the October 1990 accident, Allen had surgery on his elbow and a cervical discectomy in September 1993 due to injury sustained in an automobile accident in July 1992.
[28] She calculated the bills for the DBS implant (January 1991), the Pisces implant (July and September 1992 and March 1992), and the treatments in between. Both parties stipulated Payne paid $28,553.33 in medical expenses.
[29] Pettingill based this figure on the 1989 government life expectancy table, which estimated Allen would work until age 61 and live until age 75 (an additional 9.4 years of life expectancy).
[30] These calculations assume Allen would have worked full time for the hourly wage of $7.51, the amount he made at the time of the accident, over a period of 3.13 years. However, it was stipulated by both parties, Payne paid $45,966.00 in workers' compensation benefits.
[31] Pettingill stated if $254,747.00 was invested at the time of trial in government security treasury bonds (one for each of the eighteen years), this amount would equal the amount of income Allen would have earned had he been employed during this period.
[32] This amount is discounted based upon minimum-wage rates at the time of trial, $4.75 per hour.